UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **MICHAEL J. LOMBARD,** § | |
| *Plaintiff,* § | |
| § | |
| v. § | |
| § | Civil Action No. ___4:24-cv-4776___ |
| **BRADLEY GOBER & MONTGOMERY** § | |
| **COUNTY SHERIFF'S OFFICE,** § | |
| § | |
| *Defendants.* § | |

<u>**PLAINTIFF'S ORIGINAL COMPLAINT**</u>

*Plaintiff Michael J. Lombard and his wife and stepchildren made reports to the Montgomery County Sheriff's Office of harassment and of physical abuse by the wife's ex-husband "JS." The Sheriff's Office—then led by Rand Henderson—responded with deliberate indifference to the family's rights and safety. After Mr. Lombard complained about deputies' related actions/inactions, Deputy Bradley Gober got Mr. Lombard arrested and had him prosecuted for demonstrably baseless harassment claims from JS.*

*While the District Attorney's Office eventually saw fit to dismiss the charge and it later was expunged, the damage to Mr. Lombard had been done. He sues under 42 U.S.C. § 1983 primarily for 1st Amendment retaliation and violation of the 4th Amendment (unreasonable search/seizure, false arrest, and malicious prosecution). Any reasonable law enforcement officer would know better than to act as Deputy Gober did here.*

*Plaintiff also sues the Sheriff's Office: then-Sheriff Henderson's office had a custom or de facto policy of intentional indifference to the constitutional rights of persons like Plaintiff and his family. The Sheriff's Office so failed to train/supervise deputies that violations of the rights of citizens like Plaintiff Lombard were a predictable outcome.*

## II. JURISDICTION AND VENUE

1.    This Court has jurisdiction as this lawsuit involves federal questions (28 U.S.C. § 1331), arising under laws such as 42 U.S.C. § 1983 (Civil Action for Deprivation of Rights); and it seeks relief from a deprivation of equal rights (28 U.S.C. § 1343).

    1.1.    The rights asserted under the 1st and 4th Amendments are applicable to the actions of local governments and state actors by way of the 14th Amendment.

2.    The Court has jurisdiction over the Defendants as they collectively engaged in the described illegalities in Montgomery County, Texas. It was foreseeable they would be called to answer for them in Houston Division courts of the Southern District of Texas.

3.    Venue is proper in this Houston Division, pursuant to 28 U.S.C. § 1391, as the Southern District of Texas is where one or more Defendants reside and where a substantial part of the events or omissions giving rise to the claims occurred.

## III. PARTIES AND THEIR ROLES[1]

4.    Plaintiff Michael J. Lombard ("Lombard" or "Plaintiff") resides in Montgomery County, Texas, in the Houston Division of the Southern District of Texas federal courts.

5.    Defendant Bradley Gober ("Deputy Gober") is an individual who worked as a deputy within the Montgomery County Sheriff's Office and is sued in his individual capacity.

    5.1.    He was a primary driving force behind the arrest and prosecution of Plaintiff.

    5.2.    Deputy Gober may be served at 14262 Black Canyon Lane, Conroe, TX 77384 , or wherever else he may be found.

6.    Defendant Montgomery County Sheriff's Office is a part of Montgomery County, Texas.

---

[1] All pleadings are made in addition and in the alternative to each other and subject to correction after discovery. Factual assertions apply to all the causes of action.

6.1.    It and its then-Sheriff Rand Henderson were a final policymaker as to matters raised in this suit.

6.2.    The Sheriff's Office may be served by way of current Sheriff Wesley Doolittle at Montgomery County Sheriff's Office, #1 Criminal Justice Drive, Conroe, TX 77301, or wherever else he may be found.[2]

### IV. FURTHER FACTUAL CONTEXT

### A.  Background

7.    Plaintiff Michael Lombard formerly worked as a Special Agent with the U.S. Department of Veterans Affairs Office of Inspector General (VA OIG) and earlier the Secret Service.

8.    By way of marriage to his wife, he has four stepchildren, for whom custody was shared with his wife's ex-husband "JS."[3]

9.    Around December 4, 2018, Plaintiff's wife complained to the Sheriff's Office that JS was threatening her in ways among which was repeatedly and falsely claiming she would soon be arrested or that he otherwise had made a report to the police about her.

9.1.    Among other harassing messages from JS that Deputy Gober reviewed at Plaintiff's home were ones where JS called his ex-wife a "whore" and "stupid bitch."

---

[2] Sheriff Doolittle defeated Rand Henderson in a May 2024 primary election. Doolittle is not asserted to have engaged in any of the wrongdoing against Plaintiff and his family that is outlined in this complaint. To the extent the County or Sheriff's Office insists that an individual be named, then out of necessity it will be Doolittle in his official capacity, as successor to Rand Henderson.

[3] As of December 4, 2024, JS appeared to have a criminal history that included at least a *March 2000* guilty plea to theft, an April 2024 conviction for a *September 2022* violation of a protective order (as to Plaintiff's family), and a felony trial for child abuse set for February 2025 for a charge pending since *August 2022*. Such information about JS was readily available to Sheriff's deputies like Defendant Gober for his *July 2023* analysis of whether JS was sufficiently credible to rely on his reports to find probable cause for arresting and prosecuting Plaintiff Lombard. JS also faces a Harris County criminal mischief charge for jumping a fence and damaging a woman's cameras.

9.2.    As below, Deputy Gober nonetheless blamed Plaintiff and protected JS.

10.    Around August 30, 2019, Deputy C. Gutierrez was dispatched to Plaintiff Lombard's home in response to Plaintiff's reporting that JS was harassing Plaintiff and his family.

10.1.    Deputy Gutierrez retained copies of harassing messages from JS.

11.    Around June 11, 2021, Plaintiff Lombard made another report to the Sheriff's Office of harassment by JS, after JS followed the family on their vacation to another state and JS sent over 50 pictures of nearby locations, so they'd know he was tracking them.

12.    Around November 1, 2021, Deputy Gober met with JS in response to JS's (falsely) claiming that he was being harassed with incessant text messages from Plaintiff Lombard.

13.    JS's harassment claim against Plaintiff was untrue, as were similar claims made in a written statement given by JS dated November 3, 2021.

14.    The November 3, 2021 written statement by JS for Deputy Gober included an assertion that a family law court in December 2020 ordered Plaintiff not to contact JS in any manner.

14.1.    This was false, as a records review by Deputy Gober would have confirmed: Plaintiff has not been party to any of the family law litigation involving JS.

15.    A records review by Deputy Gober also would have revealed an October 10, 2019 finding against JS of criminal contempt of court for failure to pay child support and a March 2020 arrest for violating probation by not paying child support, with time in the County's jail.

16.    Around November 17, 2021, with results reported November 26, 2021, JS failed a court-ordered drug test, another fact Gober disregarded in assessing the credibility of JS.

17.    Around November 28, 2021, Deputy Gober contacted Plaintiff Lombard by recorded phone call about the [false] harassment claims lodged by JS against Mr. Lombard.

18.   Plaintiff responded cooperatively and detailed the timeline of events involving JS's misconduct towards Plaintiff, Plaintiff's wife, and the children.

19.   Plaintiff Lombard also invited Deputy Gober to come to the house to view evidence that would provide a full picture of JS's misconduct toward Plaintiff Lombard and his family.

20.   Around the same day, Deputy Gober met Plaintiff Lombard at Plaintiff's home and reviewed several binders of texts, plus photographs, and other communications, and received from Plaintiff Lombard a flash drive of supporting files and photographs.

21.   Plaintiff Lombard and his wife explained to Deputy Gober that whenever JS was facing a court date, JS would fabricate claims of harassment to try to delay the proceedings.

22.   They also documented for Deputy Gober how JS owed over $25,000 in child support and had followed the family on an out-of-state vacation and sent photographs of nearby locations to let them know he was tracking them.

23.   Deputy Gober recorded the interview with Plaintiff and his wife, took statements, and asserted that his (Gober's) body camera was recording all the evidence he reviewed.

   23.1.   Gober apparently did not turn this material over to the District Attorney's Office as it was deciding whether to pursue the harassment charge against Plaintiff.

24.   During his meeting with Plaintiff Lombard and his wife at their residence, Deputy Gober was given the names and phone numbers of each of their attorneys and of two private detectives who were documenting the harassment of the family by JS, but apparently never bothered to contact any of these persons.

25.   Around December 2, 2021, Deputy Gober logged in the evidence supplied by Plaintiff and his wife consisting of materials such as14 pages of messages, transcripts from the "Talking Parent" app, court documents, 18 pages of messages from JS, and one USB drive.

26.    Deputy Gober's review of the evidence led him to conclude he could not prove the validity of the claim by JS that he was being harassed by Plaintiff Lombard, such that Gober designated the case as inactive.

27.    Not long thereafter, Deputy Gober noted for the file that there was not enough probable cause to file a warrant affidavit for Plaintiff Lombard's arrest.

28.    Around March 28, 2022, Deputy Gober changed the case status to active after JS complained of receiving a text from his daughter's phone remarking "LOL" in response to a mug shot of JS from his having been in jail (though the mugshot was readily available from multiple sources on the internet).

29.    Deputy Gober then obtained a grand jury subpoena to Apple for records from Plaintiff Lombard's account, but concluded there was no evidence that could prove Plaintiff was behind any messages harassing JS, so Gober moved the case back to inactive status.

30.    Around July 1, 2022, one of the children was thrown into a wall by JS, resulting in a visible contusion to her head.

31.    The responding deputies from the Montgomery County Sheriff's Office told the injured 13-year-old female child that JS was allowed to throw her into the wall.

    31.1.    Among the responding deputies was Steven Tyler Hollingsworth.

32.    One responding deputy also told the child that her father [JS] could have hit her with a 2x4, a paddle, beat her ass with it, and that she was lucky her father was as calm as he was.

33.    Around August 6, 2022, the child was hit by JS again, yet responding deputies made no arrest and offered no medical assistance despite bruising and being unable to lift her arms.

    33.1.    Even with video of the attack available, the deputies would not protect her.

34.    Around August 7, 2022, JS again attacked the child, removing her clothes and hitting her with cables.

35.    The child had broken into a room at the house she shared with JS to document that the calmness JS had displayed to deputies actually was from marijuana he was growing; she as the abuse victim was the one they arrested, not JS.

36.    Upon picking the child up from juvenile detention, Plaintiff's wife observed that the child was covered in bruises.

37.    Around August 8, 2022, Detective Marcus Duval came to Plaintiff's house, looking for a male child who had run away from JS's home because of seeing his sister being beaten.[4]

38.    Around August 9, 2022, the daughter of JS who had been beaten by him was taken for a medical exam and was found to be unable to move her arm above shoulder level.

39.    Around August 10, 2022, child protective services (CPS) came to Plaintiff's house and documented the abuse that had been inflicted on the children by JS.

40.    Around August 18, 2022, CPS sought a protective order against JS.

41.    Around September 21, 2022, an arrest warrant was filed against JS for violating the order.

42.    Around September 23, 2022, a judge granted a final protective order against JS and he later was arrested for violation of a protective order at the children's schools.

43.    Around December 15, 2022, JS was indicted on felony child abuse charges.

44.    Around December 19, 2022, JS was arrested for second time since September 2022.

45.    Around April 2, 2023, Deputy Gober called Plaintiff and his wife and then showed up at their home around five times.

---

[4] Detective Duval was a bright exception to the disregard displayed by the Sheriff's Office toward the rights of Plaintiff, his wife, and stepchildren. After viewing video of one of the beatings, Duval worked with CPS to get felony child abuse charges filed against JS and those remain pending.

46. Around this same time, Plaintiff's wife spoke with Deputy Gober and updated him on what had happened with the violation of the protective order and JS's arrest for child abuse.

  46.1. She again emphasized she had an attorney and that is who Deputy Gober should be communicating with, but Gober never reached out to attorneys for the Lombards.

47. Deputy Gober then called Plaintiff, who relayed the same information to Gober, and Plaintiff noted his attorney had called Gober four times without a returned call.

48. Because of Gober's rudeness and dismissiveness, Plaintiff eventually hung up on him.

49. Around April 4, 2023, Plaintiff Lombard went to Montgomery County Sheriff's Office Internal Affairs and filed a complaint.

  49.1. The complaint asserted Deputy Gober engaged in official misconduct during his repeated contacts with Plaintiff's family.

  49.2. The complaint also set out how deputies at the July 1, 2022 incident in which a female child was thrown against a wall inappropriately responded by telling the child that JS was entitled to beat her if he wanted to do so.

  49.3. Deputy Gober became aware that Plaintiff had filed a complaint against him.

  49.4. The Sheriff's Office apparently took no corrective action based on the complaint.

50. From June 6, 2023 back to September 8, 2022, Deputy Gober had visited the home of JS at least 13 times, according to law enforcement records.

  50.1. Given that Deputy Gober was a patrol officer rather than detective, the frequency of the visits reflects him improperly conducting an ongoing investigation rather than responding each time to an immediate need for assistance.

  50.2. The frequency of the visits also reflects Deputy Gober's working not to protect the rights of victims, but of someone (JS) that Gober knew or should have known had

violated multiple protective orders intended to safeguard Plaintiff's family and other criminal history consistent with being the aggressor in such disputes.

51.    Around July 3, 2023, Deputy Gober provided information to a colleague (Detective Jason Salter) for use in preparing an affidavit for use in justifying the arrest of Plaintiff.

    51.1.    This was just under some three months after Plaintiff's complaint against Gober.

    51.2.    Detective Salter was not a "neutral intermediary" and instead was a coworker of Gober's who took Gober's claims at face value.

    51.3.    The County Court at Law judge who on July 6, 2023 found probable cause to issue the arrest warrant for Plaintiff Lombard could not have acted as a neutral intermediary either as he relied on the arrest affidavit which (unbeknownst to him), contained materially false statements and excluded materially exculpatory information that would have led to a different outcome had the judge known it.

52.    Deputy Gober provided information for inclusion in the arrest affidavit that was deliberately or recklessly false and material to the issue of probable cause.

    52.1.    Additionally or in the alternative, Gober's information made knowing and intentional omissions resulting in the warrant's issuance without probable cause.

    52.2.    Additionally or in the alternative, Gober's information was so lacking in indicia of probable cause as to render official belief in its existence unreasonable.

53.    As set out earlier (e.g., n. 3), by this time JS had a significant criminal history—ranging from theft to contempt of court, to violation of protective orders—that would have caused any competent officer to doubt the claims by JS that JS was the true victim of harassment.

54.    Among knowing or recklessly false material statements and omissions Deputy Gober undertook in supplying information to justify the arrest of Plaintiff Lombard:

54.1.   Gober claimed to have relied on a match of internet protocol (IP) addresses between harassing messages to JS and Plaintiff Lombard's computer used in his job (as a Special Agent with VA OIG).

54.1.1.   There is no indication Gober had expertise in IT matters that would enable him to accurately make such judgments.

54.1.2.   When Plaintiff had been employed by the VA OIG, he was required to use a Virtual Private Network (VPN), which by definition hides the IP address of the user.

54.1.3.   VA computers typically blocked traffic to sites that would not have been considered work related, such as GMAIL or ones used to send messages anonymously.

54.1.4.   The 14 emails that Gober claimed matched Plaintiff's IP address were never provided to Plaintiff or his criminal defense attorney, though producing inculpatory evidence to a defendant in a criminal prosecution would be standard practice.

54.1.5.   In fact, no information showing matching IP addresses was turned over to Plaintiff when Plaintiff was criminally charged, despite Gober's claim he obtained 12 gigabytes of information from the VA that included the matching IP data from the Pinger company.

54.1.6.   With the VA's earlier having done a forensic exam on multiple of Plaintiff's computers and cell phones, if there were evidence of harassment by Plaintiff of JS, it should have been readily obtainable from what Gober acquired.

54.2.   Deputy Gober claimed to have contacted Plaintiff Lombard in an effort to obtain information to justify a search warrant, but actually no search warrant was issued.

54.3.   Plaintiff Lombard had never before logged into the Pinger.com website nor created a related account and so could not have sent messages from it.

54.3.1.   Nor did Plaintiff otherwise ever send anonymous messages to JS.

54.3.2.   Plaintiff passed a polygraph confirming he had not sent harassing messages to JS, the results of which were provided to the DA's office. (It was only at the polygraph he first logged on to the Pinger website.)

54.4.   Deputy Gober failed to disclose for the arrest affidavit that the primary witness testimony on which he relied was from someone (JS) whose criminal history reflected dishonesty (e.g., theft charge), disregard of authority (e.g., criminal contempt of court), threatening conduct toward Plaintiff and his family (e.g., violation of protective order), and physical abuse of his own children.

54.5.   Deputy Gober also failed to disclose that JS repeatedly engaged in stalking behavior, documented with video footage of JS outside Plaintiff's home.

54.6.   Though it was important to judging credibility for probable cause, Deputy Gober also knew but failed to disclose for the affidavit that the VA found JS to have fraudulently obtained veteran's benefits—in an amount rising to a felony level.

55.   Additionally, Deputy Gober falsely claimed for the arrest affidavit that after Plaintiff Lombard told Gober that Lombard's lawyer had tried to contact Gober, Lombard hung up and Gober made no further attempts to contact Lombard.

55.1.1.   In fact, Gober thereafter made at least five documented in-person attempts to meet with Plaintiff and/or his wife at their home.

56.    Further reflective of improper motive, Deputy Gober had continued to attempt contact with Plaintiff even after regarding Plaintiff as a criminal suspect and being alerted that Plaintiff was represented by an attorney. For example:

    56.1.    While the arrest warrant claims Gober called Plaintiff once and was hung up on, Gober in fact contacted Plaintiff in person/by phone at least three times that day.

    56.2.    Security camera footage and audio recordings confirm Deputy Gober's attempting to contact Plaintiff on at least these subsequent occasions, such as around November 28, 2021 and multiple times on April 2, 2023.

57.    On that April 2, 2023, Plaintiff and his wife again informed Deputy Gober about the involvement of child protective services, the protective order, etc.

58.    Among other indications that Gober knew his actions toward Plaintiff were improper was that when an Assistant U.S. Attorney spoke with Gober around March 2024 about a case in which Plaintiff was expected to testify, Gober falsely claimed:

    58.1.    Gober could not remember Plaintiff's criminal case (as compared to logs showing Gober visiting the home of JS at least thirteen times).

    58.2.     Gober was unaware of the abuse by JS of the children (as compared to Gober's having reviewed voluminous records at Plaintiff's home of the history of abuse and harassment by JS and Gober's having told Plaintiff and his wife that Gober had recorded this material on his body camera).

59.    Based on the claims of Deputy Gober, the Montgomery County District Attorney's Office wrongly pursued a harassment charge against Plaintiff, under Case No. 23-377165.

60.    The harassment charge from the DA alleged the conduct was committed on September 30, 2021, while the arrest affidavit oddly claims it occurred "on or about May 9, 2023."

61.    Around July 18, 2023, upon learning an arrest warrant had been issued for him, Plaintiff promptly surrendered to the Montgomery County Sheriff's Office, where he was processed as an arrestee, then released on bond.

62.    Given information such as that outlined above, Deputy Gober knew or should have known the charges he pursued and persuaded others to pursue against Plaintiff Lombard were false, as would have any law enforcement officer performing duties in a competent manner.

63.    Around August 19, 2023, Deputy Gober was reassigned to work courthouse security.

    63.1.    On information and belief, this was in response to the County's concluding it was undeniable that Gober improperly handled matters related to Plaintiff and JS.

    63.2.    Reassignment from patrol work to a position as a jailer with courthouse security duties typically is not viewed as a promotion.

64.    Around October 4, 2023, Plaintiff was told to stop contacting Gober as the DA was going to dismiss charges but for Gober complaining Plaintiff frequently was contacting Gober.

    64.1.    As was known to Deputy Gober, Plaintiff had not been contacting Gober, yet Gober nonetheless misled the prosecutor's office into believing this was true.

    64.2.    This deception led to the charges being dismissed later than otherwise would have been the case.

        64.2.1.    Plaintiff passed a polygraph in confirmation of not contacting Gober.

65.    The DA's office eventually concluded that the arrest of Plaintiff obtained by Deputy Gober lacked probable cause and that the harassment charge was not supported by the evidence.

66.    Around March 27, 2024, the presiding judge granted a prosecution request for dismissal of the charges against Plaintiff Lombard.

67.    Around June 25, 2024, criminal charges against Plaintiff were ordered expunged.

67.1.    By this time the criminal case against Plaintiff had been open almost a year.

68.    Payroll records for Bradley Gober show him to have been a trainee/cadet in 2018 and in 2019 and 2020, serving on patrol for the eastern part of Montgomery County.

69.    As distinguished from a detective, it was not Deputy Gober's role as a patrol officer to conduct extended investigations.[5]

70.    Among facts demonstrating there was a long-term investigation by Deputy Gober is that (as earlier noted), according to Sheriff's Office records, Gober visited JS's residence over a dozen times between September 8, 2022 and June 6, 2023.

71.    Separately, in April 2024, a three-month-old baby in the county died from violent abuse.

71.1.    This followed a welfare visit from a Sheriff's deputy the day before that was said to have lasted over an hour but apparently only involved the deputy knocking at the door of the residence and then giving up when no one immediately answered.

71.2.    There had been over a dozen prior calls for Sheriff's assistance to the residence since September 2023.

71.3.    Consistent with the situation in which Plaintiff and his family found themselves, the case involving the death of the baby reflected a failure to adequately train deputies in dealing with domestic abuse and a deliberate disregard by the Sheriff's Department of the rights of families enduring such abuse.

---

[5] As compared to patrol officers who typically respond to short-term emergencies and enforcing laws, detectives typically gather evidence, interview witnesses, and prepare cases for prosecution. Detectives typically hold a higher rank and have more experience and training compared to patrol officers. In the events described here, Gober wrongly assumed the role of a detective, reflective of his improper motive to pursue Plaintiff and his family without regard to the rules or true victim.

71.3.1.   The failure to provide such training foreseeably resulted in the deprivation of rights of citizens ranging from the deceased infant to Plaintiff's family, plus others expected to be identified in discovery.

72.   The policy and practice of the Montgomery County Sheriff's Office at the time was to protect abusers over those abused, such as reflected by the deputies who responded to the home of JS and told his daughter that JS had the right to beat her.

73.   This was confirmed when deputies later returned to the house and arrested the daughter of JS though her medical condition made it apparent she had been physically abused.

74.   The policy and practice of protecting perpetrators of such crimes are consistent with Gober's pursuing Plaintiff Lombard rather than seeking the arrest of JS.

74.1.   Also consistent with this was how Gober treated JS as more credible though he had a known history of disobeying court orders, dishonesty, and abusive behavior.

75.   Deputy Gober's decision to respond to Plaintiff's filing of an internal complaint by pursuing Plaintiff's arrest reflected a further policy and practice of retaliating against victims in domestic abuse disputes rather than recognizing the First Amendment rights of citizens to report such crimes and to complain of related official misconduct.

75.1.   This may be compared to the situation in which the daughter of JS was beaten by JS but the responding deputies arrested that daughter reporting abuse, not JS.

76.   Around September 27, 2024, Deputy Gober resigned from the Montgomery County Sheriff's Office (though state licensing records still show him as at the Sheriff's Office).

**B.  Further Factual Context as to Fourth Amendment Violations**

1.  Unreasonable Search and Seizure/False Arrest

77.   Per facts set out earlier in this complaint, Plaintiff was arrested without probable cause.

78. The actions of Defendant Gober and the Sheriff's Office constituted an unreasonable search and seizure, which alternatively may be characterized as a false arrest.

79. Plaintiff suffered harm as a result, such as being detained at the Sheriff's Office while being processed as an arrestee, having the arrest and his mug shot publicized, suffering emotional distress, and having to hire a criminal defense attorney to defend him against the related charges and to then seek expunction.

2. Malicious Prosecution[6]

80. A criminal prosecution of Plaintiff was commenced for purported harassment of JS.

81. Plaintiff was innocent of the crime.

82. The underlying arrest and initiation of the prosecution lacked probable cause and was based on material falsehoods by Gober, material omissions by him, or both (as discussed earlier).

    82.1. Were it not for such falsehoods and/or omissions, Plaintiff Lombard would not have been prosecuted.

83. Deputy Gober wrongfully pursued the prosecution of Plaintiff in order to protect the person who actually engaged in criminal behavior (JS) and/or to punish Plaintiff for having officially reported the work-related misconduct of Gober and of other deputies.

84. Deputy Gober's malice may be inferred from the lack of probable cause for the underlying arrest, the lack of evidence supporting the charge, Gober's reckless disregard of Plaintiff's rights, and Gober's decision to ignore all the good reasons to question JS's credibility.

85. Similarly, Gober's malice was demonstrated by his willing undertaking of wrongdoing in conducting an extended investigation (such as shown by the 13 or more visits to the home

---

[6] The malicious prosecution claim additionally/alternatively is raised under the 14th Amendment.

of JS and multiple attempts to engage Plaintiff at his home) when Gober was in fact a patrol officer whose duties were to make short-term responses to crises, not those of a detective.

86.   The prosecution was terminated in Plaintiff's favor, with dismissal and then expunction of the charges.

87.   Among the foreseeable harms suffered by Plaintiff as a result were emotional distress, reputational damage, and having to hire a criminal defense attorney to protect his rights.

**C.  Facts as to Due Process Violation under Fifth and Fourteenth Amendment**

88.   The arrest of Plaintiff was a deprivation of his liberty without the process of law, in that there was not probable cause for it and it was based on information supplied by Gober, and/or omissions by him, that Gober knew to be material and misleading or at minimum that he made in reckless disregard of their truthfulness.

89.   The impropriety of the deprivation of his liberty and its arbitrary nature are further confirmed by the arrest's being in retaliation for exercise of First Amendment rights.

90.   Harms suffered by Plaintiff are similar to those outlined under the other causes of action.

**D.  Additional Facts Regarding First Amendment Retaliation**

91.   Plaintiff Lombard exercised his right to petition the government for redress of a grievance when he filed a complaint with the Montgomery County Sheriff's Office asserting that Deputy Gober engaged in misconduct and that the deputies who responded to the report of child abuse around July 1, 2022 blamed the children for the abuse they were suffering.

92.   This involved one or more matters of public concern, such as the protection of children, the prevention of crime, and law enforcement officers engaging in official misconduct.

93.   Deputy Gober was the driving force behind the subsequent arrest and prosecution of Plaintiff based on charges which Gober knew or should have known to be false.

94.    The period between Plaintiff's official complaint and Gober's pursuing Plaintiff's arrest was short enough (around 90 days) to suggest Plaintiff's reporting motivated the arrest and prosecution, particularly given that Gober was a subject of the complaint and aware of it.

95.    As a result of Deputy Gober's reprisal for Plaintiff's engaging in protected First Amendment activity, Plaintiff Lombard suffered foreseeable harms, among which were being arrested and prosecuted, emotional distress, reputational damage, and having to pay legal counsel to defend him in the criminal case.

96.    The reprisal (arrest, prosecution) was severe enough to chill another citizen aware of such facts from making their own report of police misconduct.

97.    The arrest and prosecution of Plaintiff would not have occurred but for his protected First Amendment activity in reporting official misconduct—such as the wrongdoing by Deputy Gober who went on to supply the information used to justify the arrest of Plaintiff.

   97.1.    Alternatively, at minimum, Plaintiff's protected speech in making the misconduct report substantially motivated the actions of Deputy Gober in getting Plaintiff arrested and prosecuted.

98.    Defendant Montgomery County Sheriff's Office supported Gober's efforts to have Plaintiff arrested and prosecuted, though it was aware or should have been aware of the lack of probable cause and absence of other justification for them.

   98.1.    Based on information presently available pre-discovery, the Sheriff's Office acted with malice in that it sought to discourage future complaints by citizens by punishing Plaintiff after he made his report.

## E.  Facts as to Non-Emergency Nature of the Events

99.    The arrest and prosecution at issue here were not the result of any government employee's or official's having to make a snap judgment in response to a crises or emergency.

100.    Instead, there was plenty of opportunity for review by counsel for legal sufficiency before Deputy Gober and the Sheriff's Office (acting through then-Sheriff Rand Henderson) had Plaintiff arrested and prosecuted.

## F.  Facts as to Color of State Law

101.    Deputy Gober and the Sheriff's Office (via Sheriff Henderson) were acting under color of state law in their actions that are at issue in this suit. For example:

101.1.    Deputy Gober conducted his investigation, collected evidence, interacted with the parties, and submitted information for the arrest affidavit, in his role as a deputy.

101.2.    The deputies who responded to the report by Plaintiff's stepdaughter that her father (JS) was abusing her (by telling her JS has the right to abuse her) did so in their role as employees of the Sheriff's Office—in uniforms, badged, and armed.

101.3.    Sheriff Henderson had established the policies and practices of the Sheriff's Office in his role as its elected head.

## G.  Facts as to Culpability of Sheriff's Office (and then-Sheriff Rand Henderson)

102.    Then-Sheriff Rand Henderson and the Montgomery County Sheriff's Office which he ran in his official capacity are culpable (with Gober) for the harm suffered by Plaintiff:

102.1.    <u>Existence of an Official Policy or Custom</u>: It was the policy and/or custom of the Sheriff's Office to act in deliberate disregard of the rights of victims of abuse and those who report it, instead protecting those who engaged in such crimes.

102.1.1.    For example, see the earlier discussion about Deputy Gober protecting JS as the abuser and arresting/prosecuting Plaintiff as the victim/reporter, similarly to deputies who arrested Plaintiff's stepdaughter and the ones who told her that JS had the right to abuse her, when she was the true victim.

102.1.2.    This practice or custom is so persistent and widespread that it constituted a standard operating procedure of the Sheriff's Office, as further confirmed by the earlier-referenced death of an infant.

102.2.    <u>Causal Link</u>: There is a causal link between the identified policy or custom and the alleged constitutional violation in that Gober and the other deputies acted consistently with what they understood to be the expectations for such situations, blaming and punishing the victims while protecting the perpetrators.

102.2.1.    The policy/custom was the moving force behind Plaintiff's injuries: had the Sheriff's Office instead communicated to its deputies that they were expected to intervene to protect victims of domestic abuse and harassment, Gober would have known to protect Plaintiff and his family and pursue charges instead against JS rather than against Plaintiff.

102.3.    <u>Deliberate Indifference</u>: The Sheriff's Office acted with deliberate indifference to the known or obvious consequences of its actions, being aware of the risk of constitutional violations and yet disregarding that risk.

102.3.1.    For example, Plaintiff's report of misconduct to the Sheriff's Office outlined how Gober and other deputies protected perpetrators and

blamed victims, yet it apparently took no corrective action, blessing Gober continuing to aid wrongdoing by JS, with Plaintiff then arrested.

103.   The deliberate nature of the wrongdoing by the Sheriff's Office (and Gober and the other deputies responding to the abuse reports) and their malice is further confirmed by their disregard of specific state laws governing the investigation of reports of child abuse, e.g.:

103.1.  An oral report of abuse or neglect to a law enforcement official must be recorded by at least audio means (Tex. Family Code § 261.101(d)(2)).

103.2.  A law enforcement agency that receives a report of child abuse by someone responsible for caring for the child is required to refer it immediately to the Department of Family and Protective Services (*id.* at § 261.105(a)).

103.3.  It does not appear Deputy Gober or the other deputies involved did so (with the bright exception of Detective Duval, whose viewing of video of one of the beatings led him to work with CPS to get felony child abuse charges filed against JS).

103.4.  Under Tex. Family Code § 261.3011(a)(2), law enforcement is required to be trained in how to handle abuse investigations with integrity and for best outcomes.

103.4.1.   The actions/inactions of deputies involved reflect a lack of such training and its absence predictably resulted in deprivation of citizens' rights.

**H.  Facts as to Resulting Harm and Damages Sought**

104.   As outlined above, Defendants' improper actions foreseeably caused Plaintiff to suffer harms, among which were:

104.1.  reputational damage and humiliation, such as from the mug shot of Plaintiff's arrest being publicized;

104.2. emotional distress, such as being a former federal law enforcement agent who for the first time in his life was criminally charged and falsely charged at that;

104.3. economic losses, such as having to hire a criminal defense attorney to fight the harassment charge and also to get the arrest/charge expunged; and

104.4. having to retain a civil attorney to protect his rights in this current lawsuit.

105. Even in the unlikely event that the court/jury sees fit to award no compensatory damages, Plaintiff seeks nominal damages, given the importance of 1st and 4th Amendment rights.

106. Plaintiff Lombard additionally seeks punitive damages against Defendant Gober.

106.1. As demonstrated by the facts set out above, Gober's conduct was motivated by evil intent (e.g., retaliation for the complaint filed against him by Plaintiff and/or acting to protect the perpetrators while punishing victims of abuse).

106.2. Additionally and alternatively, Deputy Gober's actions and inactions involved reckless or callous indifference to the Plaintiff's federally protected rights.

106.2.1. For example, Gober pursued the arrest and prosecution of Plaintiff in disregard of Plaintiff's rights to protect himself and punished Plaintiff for Plaintiff's protected exercise of 1st Amendment rights in reporting the misconduct by Gober and the other involved deputies.

107. Plaintiff also seeks attorney fees, costs of court, litigation expenses, an injunction against Defendants to prevent future violations, and an order Defendants have to regularly report to the court steps taken to ensure other citizens do not have their rights violated similarly.

## V. FURTHER LEGAL CONTEXT

### A. Importance of Fourth Amendment Rights

108. Defendants may assert that any harm suffered by Plaintiff is too minor to justify a lawsuit.

109. Plaintiff's view instead aligns with that of the Fifth Circuit and Supreme Court: the 4th Amendment right to be free from restraint and interference of one's person—other than "by clear and unquestionable authority of law"—is among "our most cherished constitutional rights" and a right for which none other is held "more sacred, or is more carefully guarded" by common law.[7]

110. The Fifth Circuit also has remarked (*Berry* at 596) on Supreme Court warnings that overlooking even what might be viewed as minor police infractions can cause loss of constitutional rights by accretion.

### B. Applicability of Federal Constitutional Rights

111. The First and Fourth Amendments are applicable to the states by way of the Fourteenth Amendment, as is the Fifth Amendment.

112. The First Amendment protects the rights of citizens to speak out on matters of public concern and to petition their government for redress of grievances.

113. The Fourth Amendment provides in relevant part that the "right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause . . ."

114. An arrest is widely recognized by courts as constituting one form of a seizure.

---

[7] *United States v. Berry*, 670 F.2d 583, 589–90 (5th Cir. 1982) (citing *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891).

115.   It is well-established law that an arrest must be based either on a valid arrest warrant or the arresting officer's having probable cause to believe a serious crime was committed and exigent circumstances not permitting awaiting issuance of an arrest warrant.

116.   Here, there was no emergency, and instead Deputy Gober had time to seek legal advice as to his successful efforts to get Plaintiff arrested and prosecuted, along with an opportunity to more seriously consider whether there was probable cause to pursue Plaintiff.

117.   While a judge's approval of an arrest warrant generally causes it to be presumed valid, here Deputy Gober could not have reasonably believed there was probable cause for arrest, given the false information (as outlined earlier) he provided for inclusion in the affidavit for the arrest warrant and material information he left out (such as JS's criminal history).

118.   It is well-established law, which was or should have been known to Deputy Gober and the Sheriff's Office, that under the federal constitution and 42 U.S.C. § 1983:

118.1.   an arrest must be based on probable cause to believe a crime was committed;

118.2.   a prosecution must be based on probable cause and an absence of innocence;

118.3.   a citizen may not be punished criminally for speaking on matters of public concern, such as misconduct by law enforcement officers;

118.4.   victims of crimes, and not perpetrators, are whom law enforcement should protect;

118.5.   a law enforcement officer may not supply information known to be false or that is given in reckless disregard of its truthfulness, or omit material exculpatory information, in what the officer provides to justify an arrest and prosecution; and

118.6.   state law requires law enforcement officer training in handling reports of child abuse, as a means of protecting victims of abuse.

119. 42 U.S.C. § 1983 imposes liability for the "deprivation of any rights, privileges or immunities secured by the Constitution and laws" caused by any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State."

120. To prevail on a § 1983 claim, a plaintiff generally must establish:

120.1. a violation of a right secured by the Constitution or laws of the United States; and

120.2. that it was committed by a person acting under color of state law.

121. Among relief that a plaintiff who is successful in a § 1983 lawsuit may recover are compensatory damages, past and future lost income, attorney fees and expenses, costs of court, and equitable remedies (e.g., injunction).

121.1. For example, attorney fees may be recovered under 42 U.S.C. § 1988.

## VI. FIRST CAUSE OF ACTION:
## VIOLATION OF FIRST AMENDMENT RIGHTS,
## RAISED UNDER 42 U.S.C. § 1983

122. As supported by the facts outlined above, Plaintiff Lombard engaged in protected free speech (such as with his official complaint of the deputies' misconduct), that conduct was a substantial (or the but-for) cause of Plaintiff suffering one or more adverse actions (e.g., arrest and prosecution), and this resulted in his suffering harms (e.g., having to hire a criminal defense attorney to fight the prosecution and to seek expungement).

123. The adverse actions were driven by someone (such as Deputy Gober) with knowledge of the protected activity, a motive to retaliate (such as to protect himself from Plaintiff's complaint), and who lacked a legitimate basis to pursue them.

124. The Sheriff's Office, by way of its final policymaker at the time (then Sheriff Rand Henderson) approved of the retaliatory arrest and prosecution of Plaintiff to discourage citizens from reporting misconduct by deputies that might embarrass Henderson/his office.

125.    Sheriff Henderson knew or should have known that the arrest and prosecution were improper yet (based on information and belief) blessed and ratified them in his role as the final policymaker for the Sheriff's Office.

### VII. SECOND CAUSE OF ACTION:
### VIOLATION OF FOURTH AMENDMENT RIGHTS,
### RAISED UNDER 42 U.S.C. § 1983

126.    Plaintiff Lombard's rights to be free from unreasonable search and seizure and from false arrest were violated without legal justification, such as by Deputy Gober getting Plaintiff arrested and prosecuted based on a charge for which Plaintiff was innocent and for which there was a lack of probable cause.

127.    While a judge approved the related arrest affidavit, Gober supplied material information for that affidavit that he knew to be false or gave with reckless disregard of its truthfulness, and/or he omitted giving material exculpatory information, causing Plaintiff to suffer harm.

128.    Likewise, Plaintiff's rights under the 4th Amendment (and/or 14th Amendment) were violated by the malicious prosecution pursued against him at the behest of Deputy Gober and/or then-Sheriff Rand Henderson as final policymaker for the Sheriff's Office.

129.    This prosecution was without probable cause and driven by malice (such as for the misconduct report Plaintiff had filed), Plaintiff was innocent of the harassment charge, and the outcome was that the charge was dismissed and eventually expunged, but Plaintiff nonetheless was harmed by such wrongdoing.

130.    Sheriff Rand Henderson—the official at the time who was the final policymaker for the Sheriff's Office—(based on information and belief) blessed and ratified the arrest and/or prosecution of Plaintiff though aware of their illegality.

## VIII. THIRD CAUSE OF ACTION:
## VIOLATION OF FIFTH/FOURTEENTH AMENDMENT DUE PROCESS RIGHTS,
## RAISED UNDER 42 U.S.C. § 1983

131.    The arbitrary deprivation of Plaintiff's liberty (such as by way of his arrest without probable cause) violated his constitutional rights to due process and caused him harm.

132.    Upon information and belief, the final policymaker for the Sheriff's Office at the time (then-Sheriff Rand Henderson) blessed and ratified this deprivation though aware of its illegality.

## IX. DAMAGES AND RELIEF SOUGHT

133.    As a result of the wrongful acts of one or more of the Defendants, Plaintiff Lombard suffered financial, physical, and mental harm, among which have been damage to his personal and professional reputations, profound humiliation from the arrest/prosecution of this former federal law enforcement agent, and economic harm such as having to hire a criminal defense attorney and then for this current litigation a civil attorney.

134.    As a result, Plaintiff Lombard seeks an award of compensatory damages, economic damages, and declaratory plus injunctive relief to bar Defendants from violating his and others' civil rights in a like manner in the future; also an order that Defendants take steps to prevent future violations, along with an award of pre- and post-judgment interest, attorney fees, expenses, court costs, and any other relief found to be appropriate.

135.    As noted earlier, Plaintiff also seeks exemplary damages against Deputy Gober.

136.    Among authority under which he seeks an award of attorney fees, expenses, and costs incurred in this suit is 42 U.S.C. § 1988.

## X. INAPPLICABILITY OF QUALIFIED IMMUNITY

137.    Qualified immunity for Defendant Gober is factually inapplicable to Plaintiff's claims against him for reasons such as:

137.1.  As noted earlier, the rights violated were ones that were well-established and so were known or should have been known to any competent law enforcement officer.

137.2.  Gober's malicious pursuit of the arrest and prosecution of Plaintiff relied on Gober's providing information and withholding exculpatory facts in a manner he knew or should have known was impermissible.

138.  Qualified immunity (additionally or alternatively) is inapplicable such as because one or more of the following is true:

138.1.  This is a court-created doctrine inconsistent with the text of 42 U.S.C. § 1983.

138.1.1.  For example, the rule officers can be held liable only when the violated constitutional right already was "clearly established" relies on wording not in the statute and that in fact collides with § 1983's broad and unqualified textual command.[8]

138.2.  The events here did not involve the sort of "split-second judgments" or need for "breathing room" for which the doctrine often is used to protect police officers.

138.2.1.  For example, Deputy Gober had time between his decision that Plaintiff should be arrested and when he submitted information for the arrest affidavit to consult legal counsel and/or further weigh whether probable cause in fact existed.

---

[8] 42 U.S.C. § 1983 provides in relevant part that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

138.3.  The doctrine improperly excuses all but the most blatant misconduct of government officials, while ordinary citizens are instructed ignorance of the law is no excuse.

## XI. JURY TRIAL

139.    A jury trial is requested.

## PRAYER

FOR SUCH REASONS, Plaintiff requests the Court enter judgment against Defendants and provide relief such as that requested above, additionally granting him such other and further relief in law and equity to which he may be entitled, while denying Defendants any relief.

Respectfully Submitted,

**SCHLEICHER LAW FIRM,  PLLC**

By:  /s/ David R. Schleicher
       David R. Schleicher
       TX Bar 17753780
       david@gov.law
510 Austin Ave., Ste. 110
Waco, Texas 76701
(254) 776-3939

**COUNSEL FOR PLAINTIFF LOMBARD**